**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| THE FUND FOR ANIMALS *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| DALE HALL *et al.*, | : | | |
| | : | Civil Action No.: | 03-0677 (RMU) |
| Defendants, | : | | |
| | : | Document Nos.: | 47, 50, 51 |
| and | : | | |
| | : | | |
| THE U.S. SPORTSMEN'S ALLIANCE FOUNDATION *et al.*, | : | | |
| | : | | |
| Defendant-Intervenors. | : | | |

**MEMORANDUM OPINION**

**GRANTING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; DENYING THE
DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This case comes before the court on the parties' cross-motions for summary judgment. The plaintiffs allege that the Fish and Wildlife Service (the "FWS") violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706 *et seq.*  Specifically, the plaintiffs claim that the defendants failed to analyze the cumulative effects of increased hunting prior to issuing six final agency rules initiating or expanding sport hunting in thirty-seven National Wildlife Refuges. Because the defendants did not consider the cumulative impacts of increased hunting, the court grants the plaintiffs' motion for summary judgment and denies the defendants' and defendant-

intervenors' motions for summary judgment.

## II.  BACKGROUND

### A.  Factual Background

First established by President Theodore Roosevelt in 1903, the National Wildlife Refuge System (the "refuge system") consists of over 500 wildlife refuges, with locations in all fifty states.  Compl. ¶ 81; Defs.' Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("Defs.' Opp'n") at 6.  Congress designed the Refuge System to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."  Compl. ¶ 83 (citing 16 U.S.C. § 668dd(a)).

Since the refuge system's inception, Congress has gradually authorized the practice of recreational activities in the refuges, including sport hunting.  Compl. ¶ 85; Defs.' Opp'n at 9.  Congress has simultaneously attempted to mitigate the detrimental effects of increased recreational use of the refuges.  For example, in 1997, Congress enacted the National Wildlife Refuge Improvement Act, to "ensure that opportunities are provided within the System for compatible wildlife dependent recreation," including "fishing and hunting."  Defs.' Opp'n. at 9 (citing 16 U.S.C. § 668dd(a)).  At the same time, however, the FWS must still "provid[e] for the conservation of fish, wildlife, plants, and their habitats," "monitor[] the status and trends of fish, wildlife, and plants in each refuge," and "ensure[] the biological integrity, diversity, and environmental health of the system."  16 U.S.C. § 668dd(a)(3)-(4); Compl. ¶ 97.

To ensure compliance with the 1997 Act, the FWS reviews its recreational programs

annually to determine whether to maintain, diminish, or expand opportunities for activities such as hunting and fishing. Defs.' Opp'n at 10. Before opening a refuge to recreational hunting, the FWS develops a proposed hunting plan, which involves the development of refuge-specific regulations to ensure compatibility. But, ultimately, it is the individual refuges that determine whether to allow hunting or fishing on their grounds. *Id.* at 3.

Between 1997 and 2002, the FWS issued six final rules creating or expanding recreational hunting opportunities at numerous wildlife refuges. Compl. ¶ 99; *see also* 67 Fed. Reg. 58936 (Sept. 18, 2002); 66 Fed. Reg. 46346 (Sept. 4, 2001); 65 Fed. Reg. 56396 (Sept. 18, 2000); 65 Fed. Reg. 30771 (May 12, 2000); 63 Fed. Reg. 46910, 46912 (Sept. 3, 1998); 62 Fed. Reg. 47372, 47374 (Sept. 9, 1997). The plaintiffs allege that, prior to issuing the six final rules, the FWS did not analyze the cumulative impacts on the environment. According to the plaintiffs, the failure to analyze the rules' cumulative impacts constitutes a violation of NEPA. *See generally* Compl. Though admitting that it did not prepare an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") prior to the publication of the six final rules, Ans. ¶ 103, Defs.' Opp'n at 40, the FWS claims that the individual refuges prepared EAs prior to the actual opening or expansions of refuges. Defs.' Opp'n at 3. According to the FWS, the individual refuges that conducted EAs concluded that creating or expanding recreational hunting would not have a significant impact on the environment. Defs.' Opp'n at 44. Because of the this Finding of No Significant Impact ("FONSI"), the FWS did not conduct an EIS. *Id.*

### B.  Procedural History

The plaintiff Fund for Animals (the "Fund") is a national nonprofit membership organization dedicated to "preserving animal and plant species in their natural habitats and . . .

preventing the abuse and exploitation of wild and domestic animals." Compl. ¶ 3. The Fund initiated this action on its own behalf and on behalf of its members, who regularly engage in educational, recreational and scientific activities on and near national wildlife refuges. *Id.* ¶ 5.

After the Fund filed this action, the court, concluding that it lacked subject-matter jurisdiction, granted the defendants' motion to dismiss the plaintiffs' allegations that the FWS violated NEPA and the APA by publishing its long-term goals in a Strategic Plan. That dismissal, however, left the plaintiffs' NEPA challenge to the six agency rules intact. The plaintiffs now moves for summary judgment on their claim challenging the six rules creating or expanding hunting opportunities at individual refuges. The defendants and the defendant-intervenors, in their opposition to the plaintiffs' motion, cross-move for summary judgment. The court now turns to the parties' motions.

### III.  ANALYSIS

#### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.

*Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### B. Legal Standard for the National Environmental Policy Act

Under NEPA, an agency must prepare an EIS for any proposed major federal action "significantly affecting" the quality of the human environment. 42 U.S.C. § 4332(C). To determine whether an action "significantly affects" the environment, the agency must consider several factors, among them the degree to which the effects on the quality of the human environment are likely to be highly controversial or highly uncertain, the degree to which the

action may establish a precedent for future actions, the degree to which the action may cause loss of significant scientific, cultural, or historical resources, and the degree to which the action may adversely affect an endangered or threatened species.  40 C.F.R. § 1508.27(b).

If it is not clear whether an EIS is required, the agency must draw up an EA, defined as a "concise public document" that sets forth the evidence and analysis for proceeding with an EIS.  *Id.* §§ 1501.4(b), 1508.9.  If, based on the EA, the agency determines that an EIS is warranted, it must proceed with the EIS.  *Id.* § 1501.4(d).  If not, the agency must issue a FONSI explaining why the proposed action would not significantly affect the environment.  *Id.* §§ 1501.4(e), 1508.13.

Because the NEPA process "involves an almost endless series of judgment calls . . . [t]he line-drawing decisions . . . are vested in the agencies, not the courts."  *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  Therefore, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *City of Olmsted Falls, Ohio v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C. Cir. 2002) (citing *Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983)).  In reviewing an agency's FONSI, courts in this circuit apply a four-part test that looks to see if the agency (1) accurately identified the relevant environmental concern, (2) took a "hard look" at the problem in preparing the EA, (3) is able to make a convincing case for its FONSI, and (4) if there was an impact of true significance, convincingly established that changes in the project sufficiently reduced it to a minimum.  *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 341 (D.C. Cir. 2002); *Humane Soc'y v. Hodel*, 840 F.2d 45, 62 (D.C. Cir. 1988).

### C. The Court Grants the Plaintiffs' Motion for Summary Judgment

The plaintiffs move for summary judgment, arguing that the FWS has not complied with NEPA in issuing six agency rules creating or expanding recreational hunting at thirty-six refuges. Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 1. In this case, the individual refuges prepared EAs to analyze the impact that expanding hunting opportunities would have on the refuge. Pls.' Mot. at 16; Defs.' Opp'n at 3. The plaintiffs claims that the defendants violated NEPA because many of the EAs prepared by the individual refuges only consider the impact from increased hunting on the particular refuge, and thus the EAs fail to properly consider the impact of increased hunting on the entire refuge system.[1] Pls.' Mot. at 16. As stated by the plaintiffs, "the FWS did not engage in any cumulative impacts analysis that looked at the overall, synergistic effect of significantly expanding hunting on various Refuges, particularly Refuges in the *same* general geographic areas." *Id.* (emphasis in original). In short, the plaintiffs argue that the FWS failed to take the requisite hard look at the cumulative impacts of the rules. *Id.* at 21.

The defendants, on other hand, concede that the individual EAs did not analyze the cumulative impacts of increasing hunting opportunities throughout the refuge system, but they aver that the FWS has nevertheless considered the adverse cumulative effects from expanding hunting, thereby satisfying NEPA's requirement that the agency take a "hard look" at the

---

[1] Specifically, the plaintiffs claim that "[i]n none of these EAs did the agency seriously grapple with the potential cumulative effects of its actions on migratory bird populations or habitat, endangered species recovery efforts, or the overall ability of non-hunters to enjoy bird watching or other non-consumptive pursuits on Refuges." Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 16. While both parties address the issue of cumulative effects on migratory birds, endangered species, and non-hunters, "this case is about the cumulative impacts of *all* forms of hunting that Wildlife Refuges have been opened to under the six challenged rules." Pls.' Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Reply") at 19 n.6 (emphasis added).

problem. Defs.' Opp'n at 4.  According to the defendants, the FONSIs in the individual refuges' EAs were not arbitrary or capricious because the FWS analyzes the cumulative impacts of increased hunting through its Migratory Bird Hunting Frameworks[2] and through consultations conducted pursuant to the Endangered Species Act. *Id.* at 4-5, 44.  That is, the FWS claims that it was not required to analyze the cumulative impacts of increased hunting in the NEPA-mandated EAs because other, non-NEPA statutory schemes already require it to do so.  *Id.* at 4-5.

### 1. Cumulative Impact Under NEPA

"If an agency is involved in several actions which, cumulatively, have a significant impact on the environment, then these actions should be considered in the same environmental document." *Fund for the Animals v. Clark*, 27 F. Supp. 2d 8, 13 (D.D.C. 1998) (citing 40 C.F.R. § 1508.25(a)(2)).  Further, an agency should consider actions having common timing or geography in the same environmental document.  40 C.F.R. § 1508.25(a)(3).  "Importantly, an agency may not segment actions to unreasonably restrict the scope of the environmental review process." *Clark*, 27 F. Supp. 2d at 13 (citing *Found. of Econ. Trends v. Heckler*, 756 F.2d 143, 159 (D.C. Cir. 1985)).  Stated differently, "the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust*, 290 F.3d 339 at 342.

### 2. The FWS did Not Analyze the Cumulative Impacts of the Six Final Agency Rules

The defendants concede that neither the FWS nor the individual refuge EAs analyzed the

---

[2] The Migratory Bird Hunting Frameworks "place limits on hunting that are designed to ensure that annual harvests are at a level that permits an adequate hunt while allowing the population's ability to maintain itself." Defs.' Opp'n at 29 (citing 67 Fed. Reg. 12, 502).  That is, the frameworks establish the "outside limits[] for season lengths, bag limits, and areas for migratory game bird hunting."  67 Fed. Reg. 12, 502.

cumulative impacts of the six final agency rules. Defs.' Opp'n at 4. The defendants assert that "NEPA does not require FWS to duplicate work that it is already doing [pursuant to other statutes]." *Id.* at 31. Relying on a footnote in *Izaak Walton League of America v. Marsh*, the defendants point out that "[c]ompliance with NEPA's environmental impact statement requirement has not been considered necessary when the agency's organic legislation mandates procedures for considering the environment that are 'functional equivalents' of the environmental impact statement process."[3] *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 367 n.51 (D.C. Cir. 1981).

An agency may be exempt from conducting a NEPA environmental review if a statute provides, "procedurally and substantively," for the "functional equivalent" of compliance with NEPA. *Basel Action Network v. Maritime Admin.*, 285 F. Supp. 2d 58, 63 (D.D.C. 2003); *see also Amoco Oil Co. v. EPA*, 501 F.2d 722, 749 (D.C. Cir. 1974); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 134 (D.D.C. 2004). *Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*, 869 F.2d 719, 729 n.7 (3d Cir. 1989) (stating that "where one statute requires the 'functional equivalent' of NEPA's environmental review process, a second, repetitive review under NEPA need not be undertaken"). In this case,

---

[3] The defendants do not explicitly invoke the "functional equivalency" doctrine, although they quote and cite case law applying the doctrine. Further, the defendants' reply to the plaintiffs' opposition states that it is not claiming that the Migratory Bird Frameworks and the ESA Section 7 consultation process obviates the need to prepare EAs for each refuge opening. Defs.' Reply at 4. The defendants still argue, however, that compliance with the Migratory Bird Frameworks and the ESA Section 7 consultation process allows the FWS "to ascertain whether the consequences of hunting at a given refuge is expected to have an environmentally significant impact." *Id.*; *see also id.* at 7 (stating that the Migratory Bird Frameworks and the Section 7 consultation process "inform the 'hard look' demanded by NEPA"). The court, therefore, treats their argument that the Migratory Bird Frameworks and the ESA Section 7 consultation process makes a separate NEPA review of cumulative effects unnecessary as invoking the functional equivalency doctrine.

however, the defendants' reliance on the "functional equivalency" doctrine is misplaced because neither the Migratory Bird Hunting Frameworks or the Endangered Species Act's ("ESA") Section 7 consultation process are the functional equivalents of NEPA's environmental review process.

### a. The Migratory Bird Hunting Frameworks

The defendants argue that they analyze the overall impact of hunting on migratory bird populations through their Migratory Bird Hunting Frameworks. Defs.' Opp'n at 4. Because "the 'cumulative' part of the analysis . . . is done by another branch of FWS," the defendants contend that neither the FWS nor the individual refuge managers are required to conduct a separate analysis of cumulative impacts. *Id.* The defendants' arguments are unconvincing for a number of reasons. First, the Migratory Bird Hunting Frameworks only consider the effect of actions related to migratory birds. Under NEPA, however,

> a meaningful cumulative impacts analysis must identify: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Grand Canyon Trust*, 290 F.3d at 345. The Migratory Bird Hunting Frameworks, which the defendants contend consider the cumulative impacts of hunting, only consider the effects of hunting migratory birds. *See* 67 Fed. Reg. 12502 (explaining that the FWS "develops migratory bird hunting regulations by establishing the frameworks, or outside limits, for season lengths, bag limits, and areas for migratory game bird hunting"). Thus, the Migratory Bird Hunting Frameworks do not consider the cumulative impacts of other forms of hunting, such as upland

game and big game hunting, on migratory birds. Pls.' Reply at 19. The framework process, moreover, only considers the impact of hunting on migratory bird populations, but it does not consider the overall environmental effect of increased migratory bird hunting. *Id.*

Second, the Migratory Bird Hunting Frameworks' process does not provide for public comments in the same way that NEPA does. "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); *see also Fund for the Animals v. Norton*, 281 F. Supp. 2d 209, 228 (D.D.C. 2003) (ruling that a FONSI was arbitrary and capricious because, *inter alia*, the FWS' "efforts to ensure public involvement in the EA process were deficient"). "[T]he point of the cumulative impact analysis in an EA is to provide 'sufficient [information] to alert interested members of the public to any arguable cumulative impacts involving [ ] other projects.'" *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 182-83 (D.D.C. 2004) (quoting *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 71 (D.C. Cir. 1987)). While the FWS provides information and solicits some public comments in establishing the migratory bird hunting quotas, the information available to the public and the comments solicited from the public necessarily relate only to migratory bird hunting.

Third, the administrative record does not support the defendants' contention that refuge managers rely on the Migratory Bird Hunting Frameworks in deciding whether to open the refuges to hunting. Pls.' Reply at 25. This court's "review is limited to the administrative record that was before the agency at the time it made its decision." *Rock Creek Pack Station, Inc. v. Blackwell*, 344 F. Supp. 2d 192, 201 (D.D.C. 2004). The record before the court shows that not all of the individual refuge managers considered the Migratory Bird Hunting Frameworks in

deciding whether to expand or create hunting opportunities at their refuges.[4]  Defs.' Reply at 13 (stating that "a number" of the individual refuge managers "reference" the Migratory Bird Hunting Frameworks in their analysis of the impact of increased hunting).  Indeed, although the NEPA implementing regulations allow agencies to "incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk," 40 C.F.R. § 1502.21, most of the EAs do not incorporate any non-NEPA documents by reference.  In short, the record before the court does not show that the FWS adequately considered and disclosed the environmental impact of its actions.

### b.  ESA's Section 7 Consultation Process

The defendants also argue that the refuge managers adequately considered the cumulative impacts of the six final agency rules on endangered and threatened species because "[w]hen appropriate, the refuge managers are required to consult with an FWS Ecological Services Officer to either obtain a concurrence that no impact is expected, or a determination that a full biological opinion should be prepared" pursuant to the ESA.  Defs.' Opp'n at 5. But, the ESA's Section 7 consultation process differs from the cumulative impacts analysis required by NEPA in a number of important ways.  First, the ESA Section 7 consultation process does not define

---

[4] Although the defendants argue that "[a] number of refuge managers reference the Frameworks in their opening documentation," Defs.' Reply at 13, the Administrative Record does not indicate that all of the individual refuge managers considered the cumulative impacts on the refuge system of increased hunting.  Indeed, many refuge managers only considered the impact of increased hunting on their particular refuge.  *See*, *e.g.*, 1 AR 33; 1 AR 77; 1 AR 269; 2 AR 471-472; 5 AR 1494-95; 6 AR 1690; 7 AR 2046; 7 AR 2113; 7 AR 2155; 8 AR 2362; 8 AR 2415; 8 AR 2455; 10 AR 3034; 10 AR 3100; 11 AR 3133-34; 11 AR 3419;12 AR 3601-3602; 12 AR 3638; 12 AR 3681; 12 AR 3734; 13 AR 3839-40; 14 AR 4236-37; 15 AR 4487-88; 16 AR 5022; 17 AR 5293; 17 AR 5360; 18 AR 557.  Those refuge managers that did consider the cumulative impacts of increased hunting did so in a very limited fashion without considering the cumulative impacts of increased hunting on species other than migratory birds and endangered species.  *See*, *e.g.*, 1 AR 86; 2 AR 399; 408-09; 2 AR 501-05; 6 AR 1612 1665; 6 AR 1739; 11 AR 2280; 18 AR 5592; 5552; 5561.

cumulative impacts in the same way that NEPA does. Under the ESA, cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. NEPA, on the other hand, defines "cumulative impacts" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Thus, the ESA only requires agencies to consider the cumulative impacts of non-federal actions, while NEPA requires agencies to consider the cumulative impacts of all actions.[5]

Second, the ESA's Section 7 consultation process fails to provide for public comment in the same way that NEPA does. Specifically, under the ESA's Section 7 consultation process, "there is no substitute . . . for the public comment commanded by NEPA." *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992), *aff'd*, 998 F.2d 705 (9th Cir. 1993). As stated *supra*, however, "the point of the cumulative impact analysis in an EA is to provide 'sufficient [information] to alert interested members of the public to any arguable cumulative impacts involving [] other projects.'" *Nat'l Wildlife Fed'n*, 332 F. Supp. 2d at 182-83 (quoting *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 71 (D.C.Cir. 1987)).

Lastly, the administrative record in this case does not support the defendants' contention that refuge managers rely on the information gleaned from the ESA Section 7 consultation process (or that the refuge managers even engage a Section 7 consultation in all situations) in

---

[5] Additionally, the plaintiffs allege that the six rules affect not just endangered or threatened species, but other animals as well. *See* footnote 1, *supra*.

deciding whether to open the refuges to hunting.[6]  Pls.' Reply at 25.  This court's "review is limited to the administrative record that was before the agency at the time it made its decision." *Rock Creek Pack Station, Inc.*, 344 F. Supp. 2d at 201.  But, the administrative record does not contain any indication that the refuge managers considered the cumulative impacts on the entire refuge system of increased hunting on endangered species.  Thus, the ESA Section 7 consultation process is not the functional equivalent of the cumulative impacts analysis required by NEPA.

### IV.  CONCLUSION

For the foregoing reasons, the court grants the plaintiffs' motion for summary judgment and denies the denies the defendants' and defendant-intervenors' motions for summary judgment.[7]  An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 31st day of August, 2006.

RICARDO M. URBINA
United States District Judge

---

[6]     *See* footnote 5, *supra*.

[7]     The plaintiffs claim that the court must vacate the six challenged rules pending the FWS' completion of a meaningful cumulative impacts analysis.  Pls.' Mot. at 44.  The defendants do not address this argument in their opposition.  Although the defendants do briefly address the argument in their reply to the plaintiffs' cross-motion for summary judgment, they fail to propose an alternative course of action for the court.  Accordingly, the court orders the parties to submit supplemental briefs discussing a proposed solution of this issue in light of this court's Memorandum Opinion.