UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-----------------------------------------------------
                                                 :
FUND FOR ANIMALS, *et al.*,                      :
                                                 :
              Plaintiffs,                        :
                                                 :
    v.                                           :
                                                 :    CASE NO. 1:03-CV-0677
DALE HALL, *et al.*,                             :
                                                 :
              Defendants,                        :
                                                 :    OPINION & ORDER
              and                                :    [Resolving Doc. Nos. 109, 111, 113]
                                                 :
U.S. SPORTSMEN'S ALLIANCE                         :
FOUNDATION, *et al.*,                            :
                                                 :
              Defendant-Intervenors.             :
                                                 :
-----------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

    In 2006, District Judge Ricardo M. Urbina found that the United States Fish and Wildlife

Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, when

it failed to consider the cumulative impact of the 1997 to 2005 opening and expansion of hunting

on sixty National Wildlife Refuges.[1]   In response, the Fish and Wildlife Service instructed each

affected refuge to step back in time, conduct a cumulative impact analysis, and reconsider its earlier

decision  to authorize hunting.

    The Plaintiffs now contend that the refuges again did not properly identify and measure the

_____

[1] Plaintiffs initially challenged, and Judge Urbina's order addressed, thirty-seven hunts that the Service
authorized in six final rules issued between 1997 and 2003.  The Court later allowed Plaintiffs to supplement their
complaint to add three additional final rules, promulgated between 2003 and 2005.  [Doc. 95.]

cumulative impact of hunting across the Refuge System, despite statutory language in NEPA and Judge Urbina's order requiring a cumulative analysis. [Doc. 63; Doc. 109.] The Service, on the other hand, says the revised assessments, completed in 2007, adequately gauged the cumulative impact of hunting under NEPA standards and again found no significant impact from hunting. [Doc. 111.] Defendant-Intervenors U.S. Sportsmen's Alliance Foundation and the Safari Club add that the Service's 2008 national-level cumulative impact assessment, which purports to measure the cumulative impact of increased hunting on the sixty refuges from 1997 to 2006, bolsters the Service's argument. [Doc. 113 at 15-16.]

Both sides move for summary judgment. [Doc. 109; Doc. 111; Doc. 113.] Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the Court's review is limited to whether the Service adequately considered and disclosed the environmental impact of its actions and to ensure the Service's decisions are not arbitrary or capricious.

Because the Service's refuge-level assessments comply with NEPA and Judge Urbina's order, and because the Service's conclusion that the cumulative impact of hunting will not significantly affect the environment is neither arbitrary nor capricious, the Court will not set aside the Service's final rules authorizing these hunts. The Court thus **DENIES** the Plaintiffs' motion for summary judgment, **GRANTS** the Defendants' motion for summary judgment, and **GRANTS** the Defendant-Intervenors' motion for summary judgment.

### I. Background

### A. Hunting Within the Refuge System

The National Wildlife Refuge System consists of over 540 wildlife refuges spanning more than 95 million acres, with locations in all fifty states. [Doc. 111 at 4.] The Refuge System is home

to more than 700 species of birds and 220 species of mammals, and provides habitat for more than 250 threatened and endangered species. Individual refuges vary greatly in size. The Yukon Delta National Wildlife Refuge in southwest Alaska, for example, encompasses more than 19 million acres; the Cedar Point National Wildlife Refuge along Lake Erie in Ohio consists of 2500 acres.[2]

Since the Refuge System's inception, Congress has gradually increased recreational activities in the refuges, including sport hunting. In 1997, for example, Congress identified six "wildlife-dependent recreational activities" that are "priority general public use[s]." 16 U.S.C. § 668dd(a)(3)(C). These priority uses are hunting, fishing, wildlife observation, wildlife photography, environmental education, and environmental interpretation. 16 U.S.C. § 668dd(a)(3)(A). At the same time, however, Congress has attempted to mitigate the effects of increased recreational use of the refuges. Thus, the Fish and Wildlife Service must still "provid[e] for the conservation of fish, wildlife, plants, and their habitats," "monitor[ ] the status and trends of fish, wildlife, and plants in each refuge," and "ensure[] the biological integrity, diversity, and environmental health of the system." 16 U.S.C. § 668dd(a)(3)-(4).

Compatible wildlife-dependent recreational uses within refuges "should be facilitated, subject to such restrictions or regulations as may be necessary, reasonable, and appropriate." 16 U.S.C. § 668dd(a)(3)(D). To that end, hunting is allowed only after a lengthy review process. Before opening a refuge to hunting, the refuge must complete defined steps that include: (1) prepare a Hunting Plan and a Compatibility Determination; (2) prepare a NEPA document (either an Environmental Assessment and a Finding of No Significant Impact, or an Environmental Impact Statement and

---

[2] Yukon Delta National Wildlife Refuge, U.S. Fish & Wildlife Service, http://www.fws.gov/refuges/profiles/index.cfm?id=74540 (last visited Apr. 12, 2011); Cedar Point National Wildlife Refuge, U.S. Fish & Wildlife Service, http://www.fws.gov/refuges/profiles/index.cfm?id=31541 (last visited Apr. 12, 2011).

Record of Decision); and (3) publish a proposed and a final rule in the Federal Register. [Doc. 109 at 17-18.]

Between 1997 and 2005, the Fish and Wildlife Service issued nine final rules creating or expanding recreational hunting opportunities on sixty wildlife refuges. [Doc. 1 at 37; Doc. 95 at 9.] These final rules were the subject of Judge Urbina's August 2006 summary judgment opinion.

### B. Judge Urbina's Opinion & Order

After the Plaintiffs' challenged the Service's final rules, Judge Urbina held that the Fish and Wildlife Service violated NEPA when it failed to "consider the cumulative impacts of increased hunting" prior to promulgating the rules expanding sport hunting on the refuges. *Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 130 (D.D.C. 2006).

Under NEPA, an agency must prepare an Environmental Impact Statement for any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An Environmental Impact Statement must detail the environmental impact of the proposed action, any adverse effects, alternatives to the proposed action, the relationship between man's short-term uses and the long-term effects, and any irreversible commitments of resources. *Id.*

If it is not clear whether an Environmental Impact Statement is required, the agency must prepare an Environmental Assessment that sets forth the evidence and analysis for proceeding with or without an Environmental Impact Statement. 40 C.F.R. §§ 1501.4, 1508.27. If, after conducting an Environmental Assessment, the agency determines that an Environmental Impact Statement is warranted, it must conduct one. *Id.* § 1501.4(c)-(d). If not, the agency must issue a Finding of No Significant Impact explaining why the proposed action would not significantly affect the environment. *Id.* § 1501.4(e).

When earlier before Judge Urbina, the individual refuges conducted Environmental Assessments and concluded that opening or expanding recreational hunting would not have a significant impact on the environment. Because of these Findings of No Significant Impact, the Fish and Wildlife Service did not draft an Environmental Impact Statement before publishing its final rules. In response, the Plaintiffs alleged that, prior to issuing the final rules, the Fish and Wildlife Service overlooked the cumulative impact of hunting—that is, the overall, synergistic effect of significantly expanding hunting on various refuges, particularly refuges in the same geographic areas. *Fund For Animals*, 448 F. Supp. 2d at 133.

Responding, the Service argued that, in preparing Environmental Assessments and in issuing the resulting Findings of No Significant Impact, the refuges identified and measured the adverse cumulative impact from hunting by considering the Migratory Bird Hunting Frameworks[3/] and through consultations conducted pursuant to Section 7 of the Endangered Species Act.[4/] *Id.* at 133. The Service claimed that it was not required to analyze the cumulative impact of increased hunting in the NEPA-mandated Environmental Assessments because other, non-NEPA statutory schemes already required it to do so. *Id.*

Although an "agency may be exempt from conducting a NEPA environmental review if a statute provides, procedurally and substantively, for the functional equivalent of compliance with NEPA," Judge Urbina found that neither the Migratory Bird Hunting Frameworks nor the

---

[3/] The Migratory Bird Hunting Frameworks place limits on hunting that are designed to ensure that annual harvests are at a level that permits an adequate hunt while allowing the population's ability to maintain itself. *Fund For Animals*, 448 F. Supp. 2d at 133 n.2. That is, the Frameworks establish the outside limits for season lengths, bag limits, and areas for migratory game bird hunting. *Id.*

[4/] Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires that Federal Agencies assess their "actions" to determine whether species listed as threatened or endangered under the Act may be affected by those actions, or whether critical habitat may be adversely modified.

Endangered Species Act's Section 7 consultation process were the functional equivalents of NEPA's environmental review process. *Id*.

First, the Migratory Bird Hunting Frameworks only consider the effects of hunting migratory birds. A meaningful NEPA-cumulative impact analysis, Judge Urbina noted, must consider the effect of other forms of hunting on migratory birds and the overall environmental effect of increased migratory bird hunting. *See id*. at 134-35. Second, the Migratory Bird Hunting Frameworks' process does not provide for public comments in the same way that NEPA does. *Id*. at 135. Finally, Judge Urbina found that the record did not support the Service's contention that *all* refuge managers relied on the Migratory Bird Hunting Frameworks in deciding whether to open or expand hunting. *Id*. at 135-36.

As to the Endangered Species Act's Section 7 consultation process, Judge Urbina found that it also differed from NEPA in several ways. First, the Endangered Species Act only requires agencies to consider the cumulative impact of non-federal actions, while NEPA requires agencies to consider the cumulative impact of all actions. *Id*. at 136. Second, the Act fails to provide for public comment in the same way that NEPA does. *Id*. Finally, the record did not support the Service's contention that refuge managers actually relied on the information gleaned from the Section 7 consultation in deciding whether to open or expand hunting. *Id*.

Nonetheless, despite finding that the contested final rules were promulgated in violation of NEPA, Judge Urbina held off on vacating the rules. *Id*. at 137 n.7. The Court instead granted the Fish and Wildlife Service additional time to complete a new environmental analysis. [Doc. 94 at 2.]

### C. The Service's Response to Judge Urbina's Order

### 1. The Service's Decision to Conduct a Bottom-Up Cumulative Impact Analysis

In October 2006 the Fish and Wildlife Service circulated a draft guidance memorandum to national and regional managers. The draft suggested that each affected refuge conduct a cumulative impact analysis and include those findings in a revised Environmental Assessment—a bottom-up approach to measuring the overall cumulative impact of hunting. *See* [AR 71157.] Under this analysis, refuges would first consider the impact of hunting upon their respective locations. After assembling these analyses, the Fish and Wildlife Service would make regional and national analyses of the cumulative impact of hunting.

Some Service employees questioned whether this bottom-up approach joined to a regional and national overview would adequately satisfy NEPA and Judge Urbina's order.[5] In response, other Fish and Wildlife Service employees argued that a cumulative impact analyses from the bottom up (refuge level) would better reflect the impact of hunting than from the top down (national level).[6]

## 2. The Stansell Guidance

Despite some dissension among employees, in January 2007 Kenneth Stansell, the Acting Deputy Director of the Fish and Wildlife Service, adopted the bottom-up approach and issued a final

---

[5]For example, Pat Carter, the Fish and Wildlife Service's National NEPA Coordinator, recommended that the Service conduct a single cumulative impact analysis across all the challenged refuges, instead of a refuge-by-refuge analysis. Carter referenced 40 C.F.R. § 1508.25, which says: "If an agency is involved in several actions which, cumulatively, have a significant impact on the environment, then these actions should be considered in the same environmental document," 40 C.F.R. § 1508.25(a)(2), and "an agency should consider actions having common timing or geography in the same environmental document." *Id.* § 1508.25(a)(3).

[6]Employee Dirck Byler stressed that "Refuge Managers make changes to individual refuge hunts on an annual basis for a variety of reasons . . . [and] we need to maintain flexibility to rewrite [Environmental Assessments] for individual refuges each time these changes occur." [AR 71155.] Byler also noted that the "variety of hunting activities is vastly different on refuges across the country . . . [and] [c]apturing this in a programmatic [analysis] would not be efficient as it would still require a refuge by refuge analysis for activities that are better understood at the field level." [AR 71155.] Byler continued that the Migratory Bird Hunting Frameworks already provide the Service with "an available source on the cumulative impacts to a large portion of the species at issue." [AR 71155.]

Alan Palisoul of the Service's Solicitor's Office also argued that "getting Regional input and Washington level input in order to show that someone with broader scope had input into the cumulative impacts analysis" was sufficient. [AR 71154.]

guidance memorandum to all seven Regional Directors. [AR 67493.] The Stansell Guidance directed each refuge that had opened or expanded hunting to amend their Environmental Assessment to include a new cumulative impact section. According to Deputy Director Stansell, this approach was the best way to "address[] the issues identified by the court" and comply with NEPA. [AR 67493.]

Stansell placed the primary responsibility for conducting the cumulative impact analyses and crafting NEPA-compliant documents on the individual refuges. The Stansell Guidance instructed the supervising field managers to "amend[] or completely rewrite[] the existing [Environmental Assessment] to include a cumulative impacts analysis." [AR 67499.] The Stansell Guidance also required regional- and Washington-level input: the regional offices were given review, oversight, and quality control responsibilities over the refuges within their region. Specifically, the regional offices were instructed to "[r]eview the proposed hunting package from a multi-state or flyway perspective, [and identify] apparent gaps in wider-scale analyses and if needed, amend[] each field station's [Environmental Assessment] to discuss the cumulative impacts of the proposed hunt from this larger geographical context." [AR 67500.] Finally, the Washington Office was tasked with reviewing the "proposed hunts or combination thereof" from a nationwide perspective. [AR 67500.]

The Stansell Guidance instructed each refuge to draft an Environmental Assessment that would

> describe proposed hunting in sufficient detail to provide the decision-maker with a good understanding of the past, present, and future impacts to the environment and other recreational activities to make an informed decision. If this proposed action is found to significantly affect the quality of the human environment, an [Environmental Impact Statement] is required. If a negative finding is made, a Finding of No Significant Impact . . . is prepared and signed. . . . Upon the revision of an existing [Environmental Assessment] . . . the public must be notified and

provided adequate opportunity for comment.

[AR 67496.] In completing the cumulative impact analysis, the Stansell Guidance directed each

refuge to consider:

> 1. the area in which the effects of the proposed project will be felt;
> 2. the impacts that are expected in that area from the proposed project;
> 3. other actions - past, present, and proposed, and reasonably foreseeable - that have
> had or are expected to have impacts in the same area;
> 4. the impacts or expected impacts from these other actions; and
> 5. the overall impact that can be expected if the individual impacts are allowed to
> accumulate.

[AR 67497.] With this section, the Stansell Guidance adopted Judge Urbina's instruction of what

a "meaningful cumulative impacts analysis must identify." *See Fund For Animals*, 448 F. Supp. 2d

at 134 (citing *Grand Canyon Trust v. Fed. Aviation Admin*., 290 F.3d 339, 345 (D.C. Cir. 2002)).

The Stansell Guidance then expanded upon the five *Grand Canyon* factors. The Guidance

directed the refuges to "anticipate[] [the] direct and indirect impacts that the proposed hunt will have

upon wildlife populations and other natural resources. This analysis must consider the impacts of

that action upon the species being hunting with a local, regional, and flyway context." [AR 67497.]

Next, the Stansell Guidance directed each refuge to consider whether "the proposed hunt conflicts

with other refuge wildlife-dependent recreational programs such as wildlife observation, wildlife

photography, wildlife interpretation, environmental education, or fishing." [AR 67498.] The refuges

were instructed to consider whether "the proposed hunt [will] have any impacts upon general public,

nearby residents, and refuge visitors." [AR 67498.] Each refuge was also asked to consider the

"past, present, proposed, and reasonably foreseeable actions that may have an impact on the species

being hunted, other refuge resources, and other wildlife-dependent refuge activities." [AR 67498.]

As part of these analyses, the Stansell Guidance required the refuges to consider "both the

spatial and temporal aspects of a proposed hunt"—that is, the anticipated impacts if individual hunts are allowed to accumulate. [AR 67499.]

Finally, the Stansell Guidance ordered the refuges to consider the Migratory Bird Hunting Frameworks and to conduct an Endangered Species Act Section 7 consultation.[7] Thus, in "preparing a cumulative impacts analysis for migratory species," refuges were told to "consult with State, regional, and flyway biologists." [AR 67503.] And in drafting their Environmental Assessment, refuges were instructed to use and consider the Migratory Bird Hunting Frameworks. [AR 67503.] As to the Section 7 consultation, the Stansell Guidance asked: "Will the proposed hunt either directly or indirectly impact endangered species? If so, this analysis should explain how this proposed action impacts endangered species locally, regionally, or nationally. Use and cite the Section 7 consultations, endangered species recovery plans, or any other source of local, regional, or national date to help assess the impacts of proposed hunt upon these species." [AR 67503.]

### 3. Implementation

Judge Urbina gave the Defendants until May 30, 2007 to submit the revised Environmental Assessments. [Doc. 94 at 2.] The Stansell Guidance was distributed to the regional offices on January 17, 2007. In turn, on February 1, 2007 the regional offices distributed guidance to the refuges outlining each region's implementation strategy. *See* [AR 72182.][8] The refuges were given until March 5, 2007 to complete the cumulative impact analyses, and the draft Environmental Assessments were then to be made available for public comment. [AR 72182; AR 72224.] After

---

[7] Recall, Judge Urbina found that the record did not support the Service's contention that all refuges considered the Migratory Bird Hunting Frameworks or conducted an Endangered Species Act's Section 7 consultation.

[8] Plaintiffs cite to Region Four as representative of all regions. [Doc. 109 at 26.]

the public comment period, the refuges had additional time to further revise the Environmental Assessments before submitting drafts back to the regional offices by May 1, 2007. [AR 72182.]

In addition to the Stansell Guidance and regional strategies, regional offices also provided the refuges with model Environmental Assessments. For example, on February 15, 2007, Chuck Hunter, Region Four Chief of Planning and Resource Management, emailed Region Four refuges:

> [T]he previously promised draft hunt plan and draft [Environmental Assessment] for the Upper Ouachita [National Wildlife Reserve] that is now out for public review (along with Bayou Cocodrie and Tensas River). This draft has undergone review at local, regional, and Washington offices and determined to fulfill the requirements to address cumulative effects as directed in the [Stansell Guidance]. [W]e hope you will find their revised draft [Environmental Assessment] of particular interest for you in revising your draft . . . .

[AR 72182.] By then, Hunter expected that most "refuges here have reviewed their hunt plan and have received (or otherwise contacted your state wildlife agency or agencies to receive) status and trends (and relevant harvest statistics) for resident game species . . . ." [AR 72182.] Nonetheless, he reminded the refuges that the public-comment deadline was looming—"less than three weeks away!" [AR 72182.]

Responding to questions that arose about the scope of the revised Environmental Assessments, on February 23, 2007, Chuck Hunter emailed additional guidance. [AR 72222.] The original Environmental Assessments had considered several courses of action, including "no action" (maintain the status quo of no hunting or non-expanded hunting) and the "preferred action" (open or expanded hunting). The refuges inquired whether they should reconsider the original alternatives or, conversely, consider new alternatives going forward. Hunter responded:

> **(3) You should <u>not</u> change the titles or the context of the original [Environmental Assessment's] alternatives. Further, in addition to titles, the original number of alterative should not be changed.**

The original No Action alternative that proposed to not open the hunt (not make modification of existing hunt, etc.) And the original Preferred alternative of taking the action to open/modify the hunt, are still germane. To be consistent with the remedy proposed by the Service to the Court requires only that we conduct an analysis of cumulative impacts and assess these impacts in the NEPA documents under which we opened/made modifications to the hunt. What we are in effect doing is turning back the clock to the time we were proposing the new/modified hunt and revise/write the [Environmental Assessment] with the Cumulative Impacts Analysis, rather than write a NEPA document which reflects the current situation (status quo alternative of doing what we are doing, second alternative of closing down the hunt). This may seem like semantics to all of us, but from a legal standpoint if we do the latter, our "status quo" alternative is an action which in effect has been found by the Court to be an "illegal" activity because of failure to fully comply with NEPA, and the action alternative would be taking an action to close an illegal hunt. We are being told that is not the way to go.

**(4) The fact that we are going back in time and using a "past" no action alternative, even though the real time no action is continuing the hunt as it currently occurs, really drives home the need for introductory language as well as explaining why we are revising the NEPA document in the first place . . . .**

By suggesting that we use the same alternatives as in the original [Environmental Assessments], we do not mean to say we shouldn't acknowledge what has been going on. We can and should acknowledge that the new/modified hunts have been going on since the original [Findings of No Significant Impact] were signed, and use whatever relevant information we have from the conduct of these hunts to update/or write the [Environmental Assessments]. This information can be worked into to our introductory statements of why we are revising/writing these [Environmental Assessments], in our description of the alternative that describes the current hunting program, and in the subsequent discussion of environmental consequences. The Court recognizes that we have had hunts going on - the Judge's decision to date has been not to enjoin these hunts, at least pending his review of the proposed remedies and his ultimate decision.

[AR 72225–72226] (emphasis in original). Because the refuges were only to reconsider the original

alternatives with cumulative impacts in mind, Hunter discouraged refuges from complicating the

reevaluation by adding new and different alternatives:

**(2) Revised draft hunt plans and revised draft [Environmental Assessment's] should be very similar to the original documents in format and wording, but with more details on cumulative effects . . . analysis on your preferred**

-12-

**alternatives/proposed action and general beefing up of effects on all your alternatives with Upper Ouachita serving as your template . . . .**

We have received guidance that refuges addressing already existing hunts are to not deviate (at all or not by much) from their original plan/[Environmental Assessment]. Any minor tweaks are okay, but we will not be using these revised [Environmental Assessments] for the 2007-2008 season to open a brand new area to hunting, add a species, add a new hunt category, close a hunting category, or close an entire refuge to hunting. If you have questions about what might be considered more than a "minor tweak" call me and we can discuss (but generally speaking, if you are in doubt, don't propose it).

[AR 72225] (emphasis in original).

Hunter reiterated this mandate when a refuge biologist suggested that a refuge was currently allowing hunting on "a number of species that probably should not have been considered for hunting." [AR 34766.] Hunter responded, "I believe we settled that you could not delete any species and that there is essentially no [significant] impact to hunting any of the species presently open to hunting. . . . If this has not been an issue significant [enough] to address in previous years it isn't one this year (but it could be next year). . . . If you disagree with this then elevate it [to another supervisor]." [AR 34766.]

### 4. Result

In June 2007 the Service completed the revised Environmental Assessments. [Doc. 74.] Like before, each Environmental Assessment resulted in a Finding of No Significant Impact and concluded hunting would not have a significant impact on the overall environment. [Doc. 111 at 40.]

Believing that it had now complied with NEPA, the Fish and Wildlife Service moved the Court for "an Order requiring the Parties to [] submit a notice stipulating dismissal of this case as moot." [Doc. 75 at 2.] Dissatisfied with the Service's bottom-up approach, the Plaintiffs renewed

their request that the Court vacate the challenged final rules. [Doc. 76 at 2-3.] The Plaintiffs said

the "net results of this approach are individual, site-specific [Environmental Assessments] that

contain lengthier sections entitled 'cumulative effects,' but that once again fail to actually analyze

cumulative or synergistic impacts of opening dozens of Refuges to hunting." [Doc. 76 at 3-4]

(emphasis omitted).

Judge Urbina reserved ruling on the issue and set dates for another round of summary

judgment briefing.

### 5. The 2008 Supplemental Cumulative Impacts Assessment

In September 2008, as the parties were finalizing their briefs, the Court granted the Service

leave to complete an "additional cumulative NEPA analysis." [Doc. 109 at 27; Doc. 105 at 4-5.]

According to the Service, during the process of responding to the Plaintiffs' inquiries about the

documents necessary to complete the administrative record for submission to the Court, it

determined that "it would be helpful [to] prepare a cumulative analysis of the impact of hunting on

the refuges at issue in this litigation, in a manner that more closely responded to the issues addressed

in this Court's Order." [Doc. 105 at 4-5.] This supplemental cumulative impact analysis, the

Service continued, would "enhance the cumulative assessment already completed." [Doc. 105 at 6.]

The Service engaged a private contractor to prepare an "Assessment of the Cumulative

Impacts of National Wildlife Refuge System Hunting Programs 1997-98 Through 2005-06" ("2008

Supplemental Assessment"). [AR 73583; Doc. 118 at 5-6.] The 2008 Supplemental Assessment

> evaluated refuge-specific Environmental Assessments for the hunting programs on
> the 60 refuges in order to identify the direct, indirect, and cumulative impacts of the
> proposed hunting activities on populations of migratory birds and resident wildlife
> that are hunted, non-hunted wildlife, threatened and endangered species, plant and
> habitat resources, other wildlife dependent recreational uses, cultural resources,

physical resources including air, soil and water, refuge facilities and other aspects of the human environment. We also assessed impacts of hunting by evaluating Compatibility Determinations prepared by each refuge for their respective hunting programs, and intra-Service consultations on the effects of hunting on threatened and endangered species conducted for each refuge hunting program as required by Section 7 of the Endangered Species Act . . . .

[AR 73583.] The 2008 Supplemental Assessment concluded that:

[H]unting programs on the 60 refuges collectively will not result in significant adverse cumulative impacts to the human environment. We also conclude that hunting on these refuges will not result in significant adverse cumulative impacts to the human environment when added to impacts from past refuge hunting and hunting that we reasonably expect will occur in the future. Finally, we anticipate that the impacts of hunting on any one or combination of the refuges will have negligible effect on the human environment on any or all of the other refuges.

[AR 73615.]

### 6. Plaintiffs Renew Their Challenge

The revised Environmental Assessments, Plaintiffs say, are nothing more than "post hoc justifications for decisions already made." [Doc. 109 at 37.] Instead of taking a "hard look" at the cumulative impact of hunting, Plaintiffs continue, "the refuges were on a forced march to churn out [Environmental Assessments] approving preexisting hunts with (at most) minor tweaks while determining that they had no significant impacts." [Doc. 109 at 39.] Plaintiffs say the Environmental Assessments are substantively flawed, as well, because they do not meaningfully grapple with the cumulative impact of hunting across the entire refuge system, including regional, flyway, and national level impacts. [Doc. 109 at 40.]

As to the 2008 Supplemental Assessment, Plaintiffs argue it, too, fails to comply with NEPA and Judge Urbina's ruling. Plaintiffs say the 2008 Supplemental Assessment is not a valid NEPA document because it was not made available for public comment "to the fullest extent possible."

[Doc. 109 at 35] (citing 40 C.F.R. 1500.1). Moreover, Plaintiffs continue, because the 2008 Supplemental Assessment was completed *after* the Environmental Assessments, refuge managers could not have relied on it when conducting the cumulative impact analyses. [Doc. 109 at 33.]

Addressing its bottom-up, turn-back-the-clock approach, the Fish and Wildlife Service says that neither NEPA nor Judge Urbina required the top-down, programmatic analysis that Plaintiffs demand. [Doc. 111 at 28; Doc. 119 at 3.] Likewise, the Service says, Judge Urbina did not reject the individual Environmental Assessments as legally deficient on the basis that they were refuge-specific. [Doc. 119 at 3.] Instead, Judge Urbina held that neither the Migratory Birds Hunting Frameworks or the Endangered Species Act consultation process are the functional equivalent of a NEPA cumulative impact analysis. [Doc. 119 at 3]; *Fund For Animals*, 448 F. Supp. 2d at 134-37. Accordingly, the Service contends that because the revised Environmental Assessments considered the cumulative impact of increased hunting, incorporated and expanded upon the Migratory Birds Hunting Frameworks and the Endangered Species Act, and were made available for public comment, they now comply with NEPA and Judge Urbina's order. [Doc. 111 at 18-38.]

Defendant-Intervenors add that the 2008 Supplemental Analysis, which measures the cumulative impact of increased hunting on sixty refuges from 1997 to 2006, further supports their claim that the Service complied with NEPA and Judge Urbina's order. [Doc. 113 at 15-16.] Responding to Plaintiffs contention that the 2008 Supplemental Analysis is not a proper NEPA document, the Defendant Intervenors say that because it merely "amplifies a previous analysis upon which comment was taken," that the Service was under no duty to reopen the public comment period. [Doc. 113 at 16.]

## II. Legal Standards

**1. Summary Judgment**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).

In a case involving review of a final agency action under the Administrative Procedures Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record. *See National Wilderness Inst. v. United States Army Corps of Eng'rs*, 2005 WL 691775, *7 (D.D.C. 2005). Under the APA, it is the "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Douglas Timber Operators, Inc. v. Salazar*, — F. Supp. 2d —, 2011 WL 1195848, at *3 (D.D.C. Mar. 31, 2011).

**2. The National Environmental Policy Act**

Recall that under NEPA, an agency must prepare an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). As a preliminary step, the agency may prepare an Environmental Assessment to determine whether the environmental impact of the proposed action is significant enough to warrant an Environmental Impact Statement. 40 C.F.R. § 1501.4(c). If, based on the Environmental

Assessment, the agency determines that an Environmental Impact Statement is unnecessary, the agency must issue a Finding of No Significant Impact explaining why the proposed action would not significantly affect the environment. *Id.* §§ 1501.4(e), 1508.13.

In reviewing an agency's decision to forego preparation of an Environmental Impact Statement, courts in this circuit apply a four-part test that looks to see if the agency (1) accurately identified the relevant environmental concern, (2) took a "hard look" at the problem in preparing the Environmental Assessment, (3) is able to make a convincing case for its Finding of No Significant Impact, and (4) if there was an impact of true significance, convincingly established that changes in the project sufficiently reduced it to a minimum. *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 341 (D.C. Cir. 2002).

Because the NEPA process "involves an almost endless series of judgment calls . . . [t]he line-drawing decisions . . . are vested in the agencies, not the courts." *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). Therefore, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *City of Olmsted Falls, Ohio v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C. Cir. 2002) (citing *Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983)).

The agencies have the primary responsibility to comply with NEPA. As long as an agency has taken a "hard look" at an action and has followed NEPA's procedures, a court will not overturn an agency's substantive decision unless it is arbitrary, capricious, or an abuse of discretion. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989). In determining whether an agency's decision is arbitrary and capricious, courts "consider whether the decision was based on

a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 378. The Supreme Court has emphasized that "once an agency has made a decision subject to [NEPA's] procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980).

### III. Analysis

Plaintiffs challenge both the substance of the Service's refuge-level Environmental Assessments and also the process the Service used to reach its decisions. As explained below, the Service's decision to open or expand hunting throughout the refuge system is neither arbitrary nor capricious, and its method in reaching that decision complied with NEPA.

### 1. The Service's Bottom-Up Environmental Assessments Reasonably Analyzed the Cumulative Impacts of Hunting

A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. To begin to grapple with the task of measuring hunting's local, regional and national level cumulative impact, the Service made the logical choice to initially conduct refuge-level cumulative impact analyses before considering regional and then national impacts. Beginning at the local level makes sense as each refuge considers and reconsiders the environmental impacts of its individual hunts on an annual—and sometimes seasonal—basis. *See, e.g.*, [AR 31530.] These ever-changing local influences would likely render a top-down analysis obsolete before its

completion.

Nonetheless, the Plaintiffs say these local analyses fail to address the cumulative impact of increased hunting on non-hunting visitors, migratory birds, and endangered species. The Court disagrees. The Service's bottom-up analysis identified and assessed the cumulative impact of increased hunting across the entire refuge system. The record also demonstrates that the Service's Environmental Assessments and Findings of No Significant Impact are neither arbitrary nor capricious.

### a. Non-Hunting Visitors

Plaintiffs say that hunting makes them feel unsafe and disrupts wildlife observation because of noisy gunshots, carcasses, and a general reduction in the amount of animals to observe. [Doc. 109 at 39-42.] Responding to these concerns, the Stansell Guidance specifically directed each refuge to consider whether the cumulative impact of "the proposed hunt conflicts with other refuge wildlife-dependent recreational programs such as wildlife observation, wildlife photography, wildlife interpretation, environmental education, or fishing" and whether "the proposed hunt [will] have any impacts upon general public, nearby residents, and refuge visitors." [AR 67498.] For example, in deciding to allow pheasant and turkey hunting on the DeSoto National Wildlife Refuge in Missouri Valley, Iowa, the refuge identified and analyzed the impact hunters would have on non-hunters:

> With the high levels of visitation on DeSoto Refuge, conflicts between user groups have arisen. Experience has proven that time and space zoning (e.g., establishment of separate use areas, use periods, and restrictions on the number of users) is an effective tool in eliminating conflicts between user groups. The youth and disabled turkey hunt, archery turkey hunt, and the youth pheasant hunt coincide with no other hunt season. These hunts are also very limited in the number of hunters. They are also held in areas where the general public is not actively doing another consumptive or non-consumptive activity. Therefore, other wildlife-dependant recreation would continue with no significant changes.

. . . .

Lands adjacent to the refuge are predominantly agricultural and sparsely populated, and hunting is a common past-time in the area, so the brief increase in activity on the refuge would have little effect on the public, refuge visitors, and nearby residents.

[AR 37887.]

Plaintiffs argue that to do a proper cumulative impact analysis, DeSoto should have considered recently authorized hunts at the nearby Boyer Chute Refuge in Fort Calhoun, Nebraska. In essence, Plaintiffs say the cumulative effect of authorizing hunting on both refuges deprives non-hunting visitors of "an alternative opportunity for wildlife observation without hunting." [Doc. 109 at 50.] Plaintiffs, however, are not entitled to an inviolate sanctuary for their preferred uses—Congress has determined that, to the extent possible, hunters, fishers, observers, photographers, and educators must share the refuges. Accordingly, because DeSota and Boyer Chute—like all the other refuges[9]—made informed decisions after taking a hard look at the cumulative impact of opening or expanding hunting on non-hunting visitors and surrounding communities, the process and resulting decisions are not arbitrary or capricious.

### b. Migratory Birds

Plaintiffs say that the refuges failed to look beyond their own borders when purporting to analyze the cumulative impact of hunting on hunted and non-hunted migratory birds. A proper

---

[9] *See, e.g.*, Trinity River National Wildlife Refuge, Liberty, Texas [AR 54787] ("The refuge would control access . . . to minimize wildlife disturbance and habitat degradation, while allowing compatible wildlife-dependent recreation. Some areas, such as waterfowl sanctuaries or rookeries, would be closed seasonally to minimize disturbances by hunters or other recreational users."); Mackay Island National Wildlife Refuge, Knotts Island, North Carolina [AR 20845] ("Very little non-hunting public use activity occurs in the area considered for expansion. This area has no facilities to encourage other uses and access is almost exclusively by boat. Allowing hunting in this area would not likely displace other public use activities. The refuge would control access under this alternative to minimize wildlife disturbance and habitat degradation, while allowing current and proposed compatible wildlife dependent recreation. Some areas, such as waterfowl sanctuaries, would be closed seasonally to hunting to minimize disturbance to wintering waterfowl.").

analysis, Plaintiffs argue, would have measured refuge and non-refuge hunting and its cumulative impact on total kills and overall disturbance to these species. [Doc. 109 at 42-48.]

The refuges relied, in part, on the Migratory Bird Hunting Framework in conducting their cumulative impact analyses. Recall, Judge Urbina found three problems with the Service's original reliance on the Framework: (1) it only considers the effects of hunting migratory birds; (2) it did not provide for public comments; and (3) not all refuge managers relied on it. Upon revision, each refuge relied on the Framework, and each Environmental Assessment was subjected to public comment. [Doc. 111 at 31, 33.] Thus, the remaining issue for the Court is whether the refuges went beyond the Framework to consider the cumulative impacts of hunting and "other actions" on migratory birds.

As part of the Service's general bottom-up strategy, the refuges first identified and analyzed the local impact on migratory birds. For example, in considering whether to allow waterfowl hunting on the Sacramento River National Wildlife Refuge in Sacramento, California, the Refuge considered how hunters might disturb waterfowl and other non-hunted species, beyond direct mortality.[10] Because the Refuge's terrain is dense and difficult to traverse, the areas where migratory waterfowl are hunted are only accessible by boat. Accordingly, the Refuge noted that, in addition to existing recreational boating, "[b]oating activity associated with hunting during the fall and winter can alter wildlife distribution, reduce use of particular habitats or entire areas by waterfowl and other birds, alter feeding behavior and nutritional status, and cause premature departure from areas." [AR

---

[10]  The Sacramento River Refuge Environmental Assessment is illustrative of the others; as the parties acknowledge, the individual Environmental Assessments follow the same general pattern and use similar language, customized as necessary. The Court considered the entire record—and even took the extraordinary step of requesting additional documents—but, for clarity and brevity, will cite only to the Sacramento River Refuge Environmental Assessment in this section.

49181.] The Refuge also considered the waterfowl population levels at other nearby refuges, including those at the Delevan, Colusa, and Sutter Refuges.

Next, the Sacramento River Refuge incorporated the Service's regional- and flyway-level data. At the regional level, the Refuge found that the "breeding duck population in California in 2005 was 618,241 birds, which was a 49 percent increase from the 2004 estimates." [AR 49170.] In the flyway context, the Refuge considered the Service's national-level data in the Migratory Birds Hunting Frameworks, which tracks migratory birds throughout the nation's four flyways (Pacific, Central, Mississippi, and Atlantic). [AR 49169.] "The Migratory Bird Hunting Frameworks provide season dates, bag limits, and other options for the States to select that should result in the level of harvest appropriate based upon Service-prepared annual biological assessments detailing the status of migratory game bird population. In North America, the process for establishing waterfowl hunting regulations is conducted annually." [AR 49169.] Using the Frameworks' national data, the Sacramento River Refuge determined that waterfowl hunting on it, the Delevan, Colusa, and Sutter Refuges combined only represented 1.7 percent of the Pacific Flyways duck harvest and only 0.37 percent of the national total. [AR 49172.]

With this data, and in compliance with additional California-specific regulations, the Sacramento River Refuge opened hunting to waterfowl, setting daily bag limits at seven ducks and four geese. In setting these limits, the Refuge determined that the difficult access to hunting areas, requiring the use of non-lead bullets, and disallowing hunting during breeding season would ensure that the disturbance to waterfowl will not be significant. [AR 49178-79.] The Court finds both the process used and the decision reached to be neither arbitrary nor capricious.

**c. Endangered Species**

-23-

The Plaintiffs argue that the Service's bottom-up analysis failed to measure the "overall disturbance impact" of opening and expanding hunting to other hunted-for species on endangered species. [Doc. 109 at 52.] A survey of the record reveals the opposite.

Judge Urbina recognized that the ESA and NEPA define "cumulative impact" differently. *Fund For Animals*, 448 F. Supp 2d at 136 ("the ESA only requires agencies to consider the cumulative impacts of non-federal actions, while NEPA requires agencies to consider the cumulative impacts of all actions"). To remedy this, the Stansell Guidance instructed the refuges to go beyond just non-federal data and to "[u]se and cite the Section 7 consultations, endangered species recovery plans, or any other source of local, regional, or national data to help assess the impacts of the proposed hunt upon these [endangered] species." [AR 67503.]

During the preparation of the Moosehorn National Wildlife Reserve Environmental Assessment, for example, the Refuge resolved that "[t]hrough a preventative law enforcement program, hunters would be advised of the possible presence of endangered and threatened species, and informed of the high level of protection afforded to these species." [AR 40935.] The Refuge also looked beyond its borders and found that the "majority of the species of management concern to the Refuge are not present *in this region* during the hunting period, and therefore will not be affected by this hunt program." [AR 40935] (emphasis added). After conducting a Section 7 consultation and meeting with the staff of three neighboring reserves, the Moosehorn Reserve concluded "that expansion of the hunting program at Moosehorn . . . will not adversely affect any listed species." [AR 40945.]

Yet the Plaintiffs contend that not all Environmental Assessments are as thorough, citing specifically to the Savannah National Wildlife Refuge located on the borders of Georgia and South

Carolina. The Savannah Refuge, the Plaintiffs say, should have considered the cumulative impact of hunting at four nearby refuges that the endangered wood stork relies on for habitat. [Doc. 109 at 52.] However, in considering "non-hunted wildlife," the Refuge determined that "these species have very limited home ranges and hunting could not affect their populations regionally; thus, only local effects will be discussed." [AR 49571.] And locally, the Refuge found that "[d]isturbance to wood storks should be minimal since peak use times by this species will be outside the hunt season." [AR 49572.] Thus, after conducting a Section 7 consultation, and after consulting with South Carolina and Georgia Departments of Natural Resources—the same Departments that the other four refuges consult with—the Savannah Refuge made the rational determination that hunting would not impact the wood stork.[11]

The Court thus concludes that the Service's bottom-approach to identifying and measuring the cumulative impacts of hunting on all species and the overall environment is consistent with Judge Urbina's order, NEPA, and related regulations. With this approach, the Service took a hard look at the local, regional, and national level cumulative impact of hunting. The Court also concludes that the Service's ultimate decision to open or expand hunting on the challenged refuges is not arbitrary or capricious.[12]

### 2. The Service's Environmental Assessments Are Not Post Hoc Justifications

The Plaintiffs say that the Fish and Wildlife Service decided ahead of time that it would not change or modify the challenged hunts. [Doc. 109 at 36-37.] As such, the Plaintiffs argue that the

---

[11] The same rationale applies to the South East Louisiana Refuge Complex. [Doc. 109 at 52.]

[12] Although the Court did not need to consider the 2008 Supplemental Assessment in finding that the individual Environmental Assessments reasonably identified and measured relevant cumulative impacts, the Assessment further supports the Court's conclusion that the Service's decision to open or expand hunting is not arbitrary or capricious.

revised assessments are nothing more than a paperwork exercise and did not actually inform the Service's decision making. Plaintiffs point to a few specific emails, none of which suggest to the Court that the Service had blindly committed itself to the original hunts.

First, the record does not support the Plaintiffs' contention that the refuges were not allowed to change the Environmental Assessments beyond "minor tweaks." Sure, Regional Chief Chuck Hunter relayed a message from the Washington Office that "refuges addressing already existing hunts are to not deviate (at all or not by much) from their original plan/[Environmental Assessment]." When considered in context, this email simply reflects the fact that the Service was reconsidering the cumulative impact of hunting on the original alternatives. In any event, Hunter's email does not detract from the Stansell Guidance, which specifically instructed the refuges that "[i]f this proposed action is found to significantly affect the quality of the human environment, an [Environmental Impact Statement] is required."

Second, NEPA Coordinator Pat Carter's suggestion that the Service conduct a top-down analysis, and Dirck Byler and Alan Palisoul responses to the contrary, reflect the kind of back-and-forth consideration of alternatives that proves exactly the opposite of the nefarious motive that the Plaintiffs suggest. *Cf. Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 64 (4th Cir. 1991) (disagreement among employees does not make an agency's decision arbitrary or capricious).

And finally, the refuges use of "stock language" is appropriate, especially in light of the refuges use of the Migratory Birds Hunting Frameworks to gauge the cumulative impact of hunting on migratory birds at the regional and flyway level. Where appropriate, refuges modified the model language to reflect their unique locale. Moreover, the supervisor who prepared the national data and model language indicated it was to "assist the Refuge staff with attempting to place in State and

Flyway contexts the impacts of Refuge-specific harvest (i.e., help with the cumulative impacts analysis)." [AR 67427.] The Migratory Birds Hunting Framework is a national program that measures birds across the country—the Plaintiffs argument that this national review somehow fails to measure the cumulative impact of hunting on migratory birds is incongruous with and severely undercuts Plaintiffs argument that a top-down analysis is necessary to measure cumulative impacts across the Refuge System.

## VI. Conclusion

The Fish and Wildlife Service, in finding that opening or expanding hunting across the Refuge System would not significantly impact on the environment, adequately analyzed the direct, indirect, and cumulative impact of hunting across a wide range of components of the environment. The Court thus **GRANTS** the Defendants' and the Defendant-Intervenors' motions for summary judgment and **DENIES** the Plaintiffs' motion.

IT IS SO ORDERED.


Dated: April 13, 2011                              s/      *James S. Gwin*
                                                    JAMES S. GWIN
                                                    UNITED STATES DISTRICT JUDGE